## SMITH v. UNITED STATES (two cases).*

## THOMPSON v. SAME.

(Circuit Court of Appeals, Eighth Circuit.   December 7, 1920.)

### Nos. 5245, 5246, 5380.

In Error to the District Court of the United States for the District of Nebraska; Joseph W. Woodrough, Judge.

On petition for rehearing. Denied. For former opinion, see 267 Fed. 665.

John Lee Webster, of Omaha, Neb., for plaintiffs in error.

Before HOOK and CARLAND, Circuit Judges, and TRIEBER, District Judge.

PER CURIAM. A careful reading of the learned counsel's brief filed with the petition for a rehearing has not caused us to change the conclusions reached heretofore on the questions of law involved in these writs of error. The authorities cited had been examined when the opinion of the court was prepared, and they have again been examined, including the additional authorities cited in the present brief, and we see no reason for setting aside or modifying our former opinion.

Counsel devote a part of their brief to the statement in the opinion of the court as to the number of horses owned and sold by the defendants. The earnestness with which counsel have argued this proposition has caused us to again examine the entire evidence on that point, although the conviction of the defendants would have to be affirmed, regardless of the number of horses owned and sold by the defendants, as there were so many false and fraudulent representations made by the defendants in the sales of these wild horses that there is no room for a reasonable doubt of their guilt, and the jury so found.

The evidence on that point, as is usually the case in all trials, is conflicting; the defendants testifying that they had bought a large number of horses on the Coconino county range. But their testimony is not convincing. The defendant J. Sidney Smith testified that they had about 9,000 horses on the range; but he bases his testimony upon what others told him, and the number mentioned in bills of sale given to him, as he never counted the horses. Whether these bills of sale described the number of horses alleged to have been sold correctly he does not know, but considerable doubt is thrown on the correctness of these bills of sale by the testimony of other witnesses.

Mr. John Sinclair, who testified that he sold to the defendants about 150 wild horses on the range in 1910, stated that when he prepared the bill of sale the defendant Smith wanted him to put in 1,100 wild horses, instead of the number actually sold. This he refused to do.

Mr. E. C. Hodder, a witness introduced by the defendants, and who was their attorney when the United States Live Stock Company

*Certiorari denied 254 U. S. —, 41 Sup. Ct. 450, 65 L. Ed. —.

was incorporated, produced on cross-examination a number of letters written by Mr. Tom E. Pollock, president of the Arizona Central Bank, at Flagstaff, Ariz. Mr. Pollock testified that he had received a number of letters from parties, living in different states, asking about these wild horses, offered for sale by the defendants, and he had answered them to let them alone, as he doubted whether these defendants owned as many horses as they had sold, and whether it is advisable to buy them; that the defendants J. S. Smith and Thompson spoke to him about it in 1910, and—

"I advised them not to refer to the bank in any way, because I advised both, by letter and by conversation, that the bank would absolutely refuse to have its name connected with it."

Mr. Hodder had produced a list showing the brands of several thousand horses on the range; but whether these brands were of either of the defendants the list fails to state. A copy had been sent to Mr. Pollock. Mr. Pollock testified that when this list was shown to him he either advised the defendant Thompson personally or by mail that the estimate signed for by these people (Gleason and Thomas) was simply absurd. Mr. Hodder, on cross-examination, produced a letter from Mr. Pollock to the defendant Thompson, dated September 20, 1910, in which he wrote him:

"I beg to inclose you copy you sent me regarding payments made by Mr. Gleason and Mr. Thomas, as I would not want to be put in position to have you advise people to me, expecting me to say that I don't know anything about these horses, because I think I do; nor would I, under any circumstances, advise anybody that the number you have there under the copy is correct. As I told you when you were here, I think the number is entirely too large, and I therefore request that you do not use me as reference as to the number of horses."

In June, 1911, he wrote again, in reply to a letter from the defendant Thompson, dated May 29, 1911, in which he writes:

"In the first place, you never paid Mr. Volz or Mr. Gleason a good many thousand dollars for these horses, and the transfers on the records here show, as I think I am rightly informed, the sale or trading of something over 6,000 head of horses. From the way you have handled this horse proposition, I certainly cannot in any way advise anybody to have business dealings with you, and do not want to be referred to. * * * When you were out here in person some time last year, I told you then that the situation would not warrant any such sales or trading as you folks were making, and while I did not want to injure you in any way, if you think that I am going to boost a proposition that I think in my own judgment is a very bad one, you are very much mistaken, because I will not do so. * * * There is no doubt but what there must have been quite a bunch of horses in the first outfits, but the fact that the brands in which the greater number of horses were running were mortgaged to Volz and on record here, I do not see how you have any other horses to sell or trade."

Mr. Arnold, another witness for the defendants, testified that at one time he was a partner of these defendants in these horses, and that he had bought numbers of horses from Volz and Gleason, who were partners. But in a statement which he made before the trial and which was introduced, he stated that Volz—

"had only about 100 horses, including saddle horses, colts, and mares in foal; that, while there were about 10,000 wild horses on the range, he does not know whether any of them were branded, and, if so, in whose brand; that he and the defendant shipped about 10 carloads of wild horses, about 250 head, to Omaha, and the expense of catching and shipping these 10 carloads was greater than the money realized from the sale of the horses."

Another witness for the defendants, Mr. Middleton, testified that he bought 75 horses from the defendants; that he saw several thousand horses on the range, with different brands, but they were wild, and he caught none of them, nor gathered any. He further testified that cowboys would take any horses they could get hold of and brand them with Smith's brands, without regard to right or wrong. Other witnesses introduced by the defendants testified to seeing wild horses there, and that some were shipped by the defendants, but whether they belonged to the defendants or not they did not know.

On the other hand, the witnesses for the government testified to facts based on their own knowledge. Mr. Cronen, the county recorder of deeds for Coconino county, testified that the records of his office show that there were filed for record bills of sale executed to different parties by these defendants to the number of 10,855 horses; 4,489 horses were covered by bills of sale executed by the United States Live Stock Company, 5,581 horses by the defendant J. S. Smith, and 785 by the defendant C. A. Smith. In addition, several witnesses introduced by the government testified that they had bought horses from the defendants and received bills of sale, but did not record them.

Mr. Drake testified that he is professor of forestry at the University of Montana; was forest inspector in the Coconino County Forest Reserve from December, 1906, to January 1, 1909; from that date until June 1, 1911, he was deputy supervisor of the same area, and from June 1, 1911, to September, 1914, the forest supervisor of that reserve; that during the year 1910 the entire number of horses of every kind and description, belonging to everybody, upon the National Forest Reserve in Coconino county, was 3,500, of which 1,600 were branded stock, owned by the ranchers and horsemen and used in connection with their business, and approximately half of the remainder were unbranded stock; that during the years 1909 and 1910 there were about 1,900 head of wild horses on the entire reserve, branded and unbranded. He further testified that under the state law the unbranded horses belonged to the livestock commission of the state; that from his own knowledge the United State Live Stock Company's and Smith Bros.' branded horses in the year 1909 were approximately 600; that in 1912 there were not more than 250 or 300 horses bearing the brands of the Smith Bros. and the United States Live Stock Company, and about the same number in 1913.

Mr. Ed Johnson testified that he is the live stock inspector, and that the number of horses shipped from the reserve in 1912 were between 50 and 60, nearly all broke, none of the Smith brands. The wild horses would have to be trapped. To run them down and get them an aeroplane would be best. He further testified that in 1912

and 1913 there were approximately 500 horses on the entire range, branded and unbranded.

Mr. Thomas J. Eakins testified that he was the live stock inspector at the time he testified, and has been since May, 1911; that he is thoroughly familiar with the Coconino County Forest Reserve, and with the brands known as the Smith Bros.' brands and the United States Live Stock Company's brands; that as live stock inspector he is required to keep a record of all live stock shipped out since he has been live stock inspector; that during the years 1909 and 1910 there were shipped out from all places on the reserve 510 horses, and of these 239 head by the defendants; that they had on the reserve about 300 head in 1911, 520 in 1912, and approximately the same number in 1913, and some few less in 1914.

Mr. Priest testified:

"I know the brands on the forest reserve; have been familiar with them for years. I would say there was 300 or 400 horses on the Coconino County Reserve during the year 1910 bearing the Smith brands. I would say there was from 1,500 to 2,000 horses of all brands, including farmers and rangers and everybody, during that time."

From this brief review of the testimony we see no reason for making any changes in the former opinion of the court.

The petition for rehearing is denied.